STATE of Missouri, Respondent,

v.

Donald COX, Appellant.

No. 47713.

Supreme Court of Missouri,
Division No. 1.

March 14, 1960.

Charles M. Shaw, Clayton, for appellant.

John M. Dalton, Atty. Gen., Jerry B. Buxton, Asst. Atty. Gen., for respondent.

HOLLINGSWORTH, Judge.

Defendant has appealed from the judgment and sentence imposed upon him in accordance with the verdict of a jury finding him guilty of the crime of manslaughter in the killing of Roy Donald Ellis by an act of culpable negligence and assessing his punishment at imprisonment in the State Penitentiary for a term of eight years. He has filed no brief and we, therefore, review the valid assignments of error set forth in his motion for new trial as required by S.Ct. Rule 27.20 and the essentials of the record as required by S.Ct. Rule 28.02, 42 V.A.M.S. The sufficiency of the evidence to support the verdict and judgment is not challenged. A brief summary will suffice for discussion and determination of the errors assigned.

It is admitted that Roy Donald Ellis and his wife, Vivian, were fatally injured on the evening of September 22, 1958, when their automobile, in which they were riding eastward on U. S. Highway 40 about 1,500 feet east of Lindbergh Boulevard in St. Louis County, was struck from the rear by an eastbound automobile driven by defendant.

The evidence in behalf of the State tends to show, as follows: Defendant, aged 22 years, lived in Kirkwood, St. Louis County. On the day of the collision, he and four other male companions, Eugene Bowman, Oscar Bowman, Earl Simpson and Charles Webster, spent the greater part of the day riding about St. Louis County in defendant's automobile, during which time defendant purchased a total of three pints of whiskey and thirty cans of beer. The five of them had consumed two pints of the whiskey and thirteen cans of the beer prior to the collision. Sometime prior to the collision, which occurred about eight o'clock in the evening, Oscar Bowman and Charles Webster left the car. After they left, defendant, Eugene Bowman and Earl Simpson continued their ride until about 7:30 p. m., at which time they came upon Robert Dandridge in Webster Groves, who was driving

a 1956 Ford automobile, in which Eugene Portis and Doug Mercer were also riding. Following some conversation, defendant and Dandridge agreed that they engage in a "drag race" and they, with their respective companions, thereupon drove their cars north on Brentwood Boulevard to Highway 40 for the race.

Highway 40, as it extends westward for a distance of several miles from Brentwood Boulevard, consists generally of four traffic lanes, the two north lanes being used for westbound traffic and the two south lanes being used for eastbound traffic. The two lanes on the north are separated from the two lanes on the south by a median strip of 20 or more feet in width. As the highway extends westward from Brentwood Boulevard, it crosses a viaduct over Lindbergh Boulevard, a north-south arterial highway. For a distance of approximately 800 feet (or more) on each side of the viaduct, the width of Highway 40 on each side of the median strip is widened into three lanes. Eastward from the viaduct, the highway gradually declines a total of approximately 49 feet to a point 1300–1500 feet, where it levels off. To the west of the viaduct, the grade is substantially level for a distance of any import in this case. Mercury vapor lamps are suspended from high concrete standards along both sides of the ramp east and west of the viaduct.

Upon reaching Highway 40, the two cars, headed west, with their headlights burning, were placed side by side in the two westbound (north) lanes and at a signal the race started. Dandridge's car forged ahead and stayed in front until he reached the viaduct, when he slowed up. Defendant thereupon passed him and went on several miles beyond Dandridge's sight. Dandridge went on west, however, a mile or more beyond the viaduct, where he pulled off the highway and awaited defendant's return. Upon defendant's return, they agreed to and did race their cars back east on the eastbound (south) lanes. Again Dandridge forged ahead but, according to Dandridge, he slowed his car up before reaching the

viaduct. In any event, whether Dandridge slowed or did not slow his car, defendant passed him and continued over the viaduct and on thence east to the point of collision, without slowing his speed until he applied his brakes "right before" he hit the Ellis car. When defendant applied his brakes, his car "pulled to the right" and skidded into the Ellis car, the right front of his car striking the left rear of Ellis' car.

Claude Hall, aged 54 years, a carpenter-maintenance employee of Emerson Electric Company, was driving his car westward on Highway 40 toward the Lindbergh viaduct when he saw the impending collision. He testified: It was after dark, "twilight like"; he had turned on his car lights. He saw the Ellis car coming eastward down the incline at a speed of 50 to 55 miles per hour. He then saw two cars (defendant's and Dandridge's) come over the hill (Lindbergh viaduct) side by side, traveling at a high rate of speed, which he estimated at 90 to 100 miles per hour. Sensing what was about to occur and there being no oncoming traffic to his rear, he stopped and observed the cars for several seconds and was 400–450 feet east of the point of the impact when it occurred. The Ellis car "exploded" when defendant's car struck it. The bodies of Mr. and Mrs. Ellis "flew out of it" as it turned over and went 150–200 feet down into a ditch on the south side of the south highway shoulder and came to rest on its top. Defendant's car skidded on eastward along the highway. When it had stopped, defendant jumped out of it, ran to and lay down on the south shoulder of the highway. Fire enveloped the Ellis car.

The Ladue city police arrived in a few minutes. Their testimony was: They found a collection of debris at a point on the highway where the collision appeared to have occurred. The Ellis car was completely off the highway 240 feet from that point. Defendant's car, still upon the highway, was 333 feet east of the debris. The Ellis car had made a series of broken skid marks from the point of the debris to where it lay. Skid marks made by defendant's

car began 21 feet west of the debris and continued to the point where it had stopped on the highway. Mr. and Mrs. Ellis lay upon the shoulder near the point of collision; the defendant lay upon the shoulder of the highway opposite his car. Two of his companions were standing by him. A pint of whiskey and some beer were found in defendant's car.

Later that night defendant and his companion, Simpson, were taken to the police station. Upon being questioned, defendant stated he had been racing with another automobile and that during the race he had the accident. Asked if he "was doing more than 70," he said, "Yes." Asked if he could have been "doing as much as 90 miles per hour," he said, "Yes." Asked if it "could have been up to 100 miles an hour," he said, "I don't know; it could have been. I wasn't watching my speedometer." Defendant also said he had drunk "a few beers during the day." Defendant further said he was unable to avoid hitting the Ellis car, he was just going too fast, and that when he attempted to apply his brakes his car seemed to pull to the right.

Earl Simpson, one of defendant's riding companions, estimated the maximum speed of defendant's car at 80, 90 or 100 miles per hour during both races. Eugene Portis, one of Dandridge's riding companions, estimated the speed of defendant's car at more than 90 miles when it passed Dandridge's car in the racing. Jack Schneider, riding in a third car, observed the eastbound racing cars and estimated their speed at 90 to 95 miles an hour.

Over objection of defendant, the coroner of St. Louis County, a witness in behalf of the State, identified and the court admitted into evidence certain portions of a transcript of testimony given by defendant at the inquest held upon the death of Mr. and Mrs. Ellis on September 23, 1958. That transcript, at its beginning, shows as follows:

"Coroner: Mr. Cox, at this point I will advise you that it's your privilege to testify at this inquest, or to refuse to testify. You may stand upon your constitutional rights as an American citizen and refuse to testify on the grounds that anything you say may incriminate you now; what is your desire? "Witness: I'll testify."

Thereafter, as shown by additional portions of the transcript read to the jury, defendant gave his version of the races in which he and Dandridge engaged. He stated that in passing Dandridge he was "doing about 70, 75, I guess"; that during the eastbound race he passed Dandridge about one-half mile before reaching Lindbergh viaduct; that when he reached the viaduct he saw the Ellis car and was going to pass it, but "it seemed like my car wouldn't straighten up or something, so when I stepped in, why that's when I hit him."

"Coroner: Now, how far ahead of you was he when you first saw him?

\* \* \* \* \*

"Witness: Oh, he was—I didn't see him at first until I got around, you know, way around the thing that way— I was too—I was too close to get away from it, you know, the car \* \* \*.

"Coroner: Well, what did you do, · hit your brake?

"Witness: I hit my brakes, and that made my front end, it was caught over to him; it hit him, smashed right into him.

"Coroner: Into what part of his car?

"Witness: I think on his back fender, something like that."

Defendant's counsel read additional portions of the transcript to the jury, which revealed that an alcoholic content analysis of defendant's blood taken at 10:15 p. m. on the night of the collision showed no measurable amount of consumed alcohol in his system.

Defendant testified at the trial that prior to the racing he had drunk only one can of beer and no whiskey; that on the east-

bound race he did not pass the Dandridge car until it slowed up west of the viaduct; that his speed when he passed Dandridge about 100 yards west of the viaduct was "about 65 or 70, I guess"; that after passing Dandridge he "slowed down a little" by raising his foot from the accelerator; that he went over the viaduct at "55 or 60—something like that"; that he saw the Ellis car after he "got to coming down the hill," at which time it "appeared to be in the right-hand lane"; that he (defendant) continued in the center lane and when he came to the point of the merger of the three lanes into two lanes "then I found myself behind—in the same lane he was in"; that the Ellis car was then 50 or 100 yards from him; that "I tried to pass him, * * * I pulled out" and "all of a sudden my car started pulling back to the right. * * * I tried to pull it back to the left"; that he could not pull it back and that he then "mashed on the brakes" and his car skidded to the right, the right front of his car striking the left rear of the Ellis car.

The State, over objection of defendant, was permitted on cross-examination to interrogate him as to whether, on October 9, 1958, he was convicted of operating his automobile without a state driver's license. Defendant answered that "I had a receipt * * * I don't think so." On redirect examination, defendant said he did not know whether he pleaded guilty or not guilty to that offense.

Defendant's first assignment is that the court erred in allowing the prosecuting attorney "to make statements in his closing argument which greatly prejudiced and inflamed the minds and passions of the jury to such an extent that the defendant could not have a fair and impartial trial." The assignment must be overruled for two reasons: (1) it does not set forth the statements of which complaint is made or the grounds upon which they are alleged to have been erroneous or prejudicial, as required by S.Ct.Rule 27.20; (2) none of the argument is set forth in the transcript and, of course, the allegations of the motion do not prove themselves.

The second assignment is that the court erred in admitting the testimony given at the inquest by defendant, on grounds he was not represented by counsel and which testimony, the motion alleges, was neither a confession nor a statement against interest; and "that the manner in which it was given * * * was confusing and misleading." Again the motion wholly fails to point out how or in what manner any portion of the testimony read to the jury was incompetent or irrelevant as admissions against interest. See S.Ct.Rule 27.20. However, not only does the transcript of the coroner's inquest show that defendant was advised of his rights and the responsibilities assumed by him in testifying at the inquest and that he, after being so advised, voluntarily testified, but the transcript on this appeal shows that on cross-examination during the trial of this case defendant admitted that prior to testifying at the inquest he had been advised by the coroner as herein above set forth and that, being so advised, he nevertheless elected to testify. A careful reading of the portions read to the jury reveals no error in their admission. See State v. Mayabb, Mo.Sup., 316 S.W.2d 609, 611.

The third assignment is that the court erred in allowing the State to ask defendant whether he had been convicted of operating a motor vehicle without a State driver's license. Sections 302.020 and 302.340 RSMo 1949, V.A.M.S. (to which revision all statutory references are made), make it a misdemeanor to operate a motor vehicle upon the highways of this State unless such operator has a valid license issued under the provisions of Chapter 302 of said statutes. Section 491.050 expressly permits proof of a prior conviction of a witness of a criminal offense to affect his credibility, either by the record or by his own cross-examination. Section 556.010 defines a "criminal offense" to mean any offense, misdemeanor or felony, for which

any imprisonment or fine, or both, may by law be inflicted. By virtue of the foregoing statutes, the right of the State to cross-examine defendant with reference to a prior conviction for operating a motor vehicle without a driver's license was clearly lawful. Fisher v. Gunn, Mo., 270 S.W.2d 869, 876; Brown v. Anthony Mfg. Co., Mo., 311 S.W.2d 23, 28.

■ The fourth and final assignment is that the court erred in refusing his proffered Instruction A for the reason that it was the duty of the court to instruct on all theories of the law involved in the case and that said instruction set forth the defense testified to by defendant. Instruction A is as follows:

"The Court instructs the Jury that if you find and believe from the evidence that on the occasion in question while Defendant was driving his automobile over and along U. S. Highway 40, * * * and if you find and believe that when Defendant's automobile was within a short distance from the scene of the accident mentioned in the evidence that Defendant was operating his automobile at the rate of 55–60 miles-per-hour, and that Defendant's automobile developed mechanical failures causing Defendant to lose control of his automobile, and that Defendant was thereby confronted with a sudden emergency with no time to deliberate, if you so find, then the Court instructs you that the Defendant was only required to exercise that degree of care that an ordinary careful and prudent person would exercise under the same or similar circumstances, and if you find that he did exercise such care after the mechanical failures of his automobile, then under the circumstances and in the emergency aforesaid, the Court instructs you that the Defendant was not guilty of culpable or gross negligence, and you should acquit him; * * *."

The transcript shows that in accordance with S.Ct.Rule 26.02(6) the trial court, by other instructions given in the case, had instructed the jury upon all questions of law necessary for their guidance in returning their verdict. The question is, therefore, whether Instruction A correctly hypothesized a fact situation supported by the testimony of defendant which, if believed by the jury, would have entitled him to a verdict of acquittal. Of course, irrespective of how culpably negligent defendant may have been in the operation of his car prior to and at the time he drove it up to and over the viaduct, yet he would not be guilty of the offense here charged if he then desisted and thereafter so operated his car that the Ellis car was no longer endangered by reason of any prior or continuing culpable negligence on his part and the collision was caused solely by reason of the sudden development of a mechanical defect in his car that brought about the collision as he attempted in a non-culpably negligent manner to pass around it. But the instruction submits no such a factual situation and neither does defendant's testimony warrant such a submission. The instruction, at best, submits a finding that when defendant *"was within a short distance"* from the point of collision he was driving at 50–60 miles per hour and that a mechanical defect developed in the car which caused him to lose control of it thereby creating an emergency. Then and only then does the instruction require him to begin to exercise the degree of care of a non-negligent driver confronted with such an emergency, wholly without regard to however culpably negligent he may have been in creating the emergency by coming within such dangerous proximity to the Ellis car as to necessitate an attempt on his part to avoid it by going around it.

Furthermore, when analyzed, that is the burden and effect of his testimony. He said that although he had seen the Ellis car after coming over the viaduct he thought it was in the right lane and "then I found myself behind—in the same lane he was in." Thus the jury could have found that the emergency was created by his own cul-

pable negligence. The instruction, however, would nonetheless excuse him from the consequences of coming so dangerously close to the Ellis car as to require precipitant action in attempting to avoid it by swerving around it, without any consideration whatever to be given by the jury as to whether his prior or continuing culpable negligence, if any, was a directly contributing factor in causing the collision. The trial court did not err in refusing it.

We have examined the essential portions of the record. The information is in due form. Section 559.070; State v. Renfro, Mo., 279 S.W. 702, 703; State v. Murphy, 324 Mo. 183, 23 S.W.2d 136, 137. The verdict is responsive to the issues and the punishment assessed is within the limits of the statute. Section 559.140. Defendant was duly arraigned and entered a plea of not guilty in conformity with S.Ct.Rule 25.04. He and his counsel were present at all pretrial, trial and after-trial proceedings. He was granted due allocution and the judgment and sentence are in conformity with S.Ct.Rules 27.08 and 27.09.

The judgment is affirmed.

All concur.